## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**BARRY BROWN,**                          :

      **Plaintiff**              :   **CIVIL ACTION NO. 3:07-0621**

      **v.**                   :
                         **(MANNION, M.J.)**

**UNITED STATES OF AMERICA,**      :

      **Defendants**             :

### MEMORANDUM

This matter is before the court following a non-jury trial to determine whether the plaintiff, Barry Brown, ("plaintiff"), has established by a preponderance of the evidence his claim against the defendant, United States of America, ("defendant"), pursuant to the Federal Tort Claims Act, ("FTCA"), 28 U.S.C. §§1346, 2671, et seq. After considering the testimony and evidence presented at the trial, the court finds that the plaintiff has established his claim against the defendant. Therefore, judgment will be entered in favor of the plaintiff.

Pursuant to Federal Rule of Civil Procedure 52(a), this memorandum sets forth the court's findings of fact and conclusions of law regarding the plaintiff's claim.

## I.    PROCEDURAL HISTORY

By way of relevant background, on April 2, 2007, the plaintiff initiated the instant action pursuant to the FTCA claiming negligence on behalf of the

defendant in relation to an automobile accident which occurred on March 22, 2004[1]. (Doc. No. 1).  The defendant filed an answer to the complaint on June 4, 2007.  (Doc. No. 7).

On October 1, 2007, the parties consented to have a United States Magistrate Judge conduct any and all proceedings in the instant action pursuant to 28 U.S.C. §636(c) and Federal Rule of Civil Procedure 73. (Doc. No. 12). As a result, the matter was referred to the undersigned.

The final pre-trial conference was held on June 12, 2008.  On June 18, 2008, the parties filed their proposed findings of fact and conclusions of law. (Doc. Nos. 23, 24).  A non-jury trial was held on June 23, 2008.

## II.    FINDINGS OF FACT

Upon careful review of the testimony and evidence presented at trial, as well as the submissions of counsel, the court makes the following findings of fact:

The plaintiff is a fifty-one year old individual, who currently resides in West Pittston, Pennsylvania, with his wife of fourteen years. The couple has no children.  Since 1988, the plaintiff has worked as an account executive in the radio advertising industry.

In 2002, while landscaping at his home, the plaintiff lifted a tree and

---

[1]There is no dispute that the plaintiff properly exhausted his administrative remedies under the FTCA.

injured his back. The plaintiff initially treated with his family physician, James S. Butcofski, M.D., who ordered an MRI and x-rays of the plaintiff's lumbar spine. The plaintiff was treated conservatively with medication and restrictions. Ultimately, when the plaintiff's condition did not improve, he was referred to David J. Sedor, M.D., a neurosurgeon.

On June 24, 2002, Dr. Sedor noted that the plaintiff presented with left leg pain, back pain, and L4-5 level radiculopathy. Imaging exhibited a disc herniation "at the second to the bottom" or 5th level for which the plaintiff opted to undergo formal physical therapy. (P-3, Office Notes of Dr. Sedor dated June 24, 2002).

On July 17, 2002, the plaintiff returned to Dr. Sedor indicating that, despite physical therapy and nerve blocks, he continued to experience back and leg pain. At that time, the plaintiff expressed his desire to proceed with surgical intervention. (P-3, Office Notes of Dr. Sedor dated July 17, 2002). On July 26, 2002, the plaintiff underwent a lumbar laminectomy and diskectomy.

Office notes from Dr. Sedor dated August 5, 2002, indicate that the plaintiff returned for a post-operative visit. (P-3, Office Notes of Dr. Sedor dated August 5, 2002). At that visit, the plaintiff indicated that he had "no pain at all," and was not taking any pain medications. (Id.). Although the plaintiff complained of some paresthesias of the right foot, Dr. Sedor indicated that the plaintiff was progressing well and released the plaintiff to work part-time for one week, after which he would be released for a trial course of full-time

3

work. (Id.). The plaintiff was also to undergo hydro- and advance physical therapy at Pro Rehabilitation Service, ("Pro Rehab"), for his lumbar spine. (Id.). The plaintiff recovered so well that he required no further treatment from Dr. Sedor with respect to this injury.

Subsequent to his surgery, the plaintiff testified that he was able to return to a normal state of health with no limitations or restrictions. Dr. Sedor confirmed this, indicating that the surgery was remarkably successful. Further, between the plaintiff's surgery in 2002 and the accident in question here, Dr. Butcofski indicated that the plaintiff was "doing fine" and functioning normally.

On March 22, 2004, the plaintiff was operating a 2004 Mercedes Benz automobile. On that date, at approximately 10:00 a.m., the plaintiff was stopped at the intersection of Spruce Street and Wyoming Avenue in Scranton, Pennsylvania. At that time, United States Marine Sgt. Thomas Fuller, acting within the course and scope of his employment, was operating a 2000 Chevrolet Cavalier. Sgt. Fuller was in the vehicle behind the plaintiff's vehicle. Sgt. Fuller saw the plaintiff's vehicle stopped in front of him at the red light and brought his vehicle to a stop approximately four to six feet behind the plaintiff's vehicle. Sgt. Fuller testified he noticed the plaintiff's vehicle coasting forward and instinctually released his foot from the brake resulting in his car moving forward as well. At the same time, Sgt. Fuller noticed that the cuff of his uniform pant leg had fallen to the car floor and bent forward to fix his pant

4

leg. It was at this time that Sgt. Fuller's vehicle made contact with the rear of the plaintiff's vehicle.  Sgt. Fuller indicated that he was not looking forward at the plaintiff's vehicle at the time of the impact. He forthrightly admitted that the accident was his fault and that the plaintiff did nothing to cause the accident.[2]

Subsequent to the accident, Sgt. Fuller exited his vehicle to check on the plaintiff. The plaintiff exited his vehicle unassisted and immediately experienced pain in his head, neck, shoulder region and lower back. The plaintiff dialed 911 on his cell phone and the police and Emergency Medical Technicians were summoned to the scene. The plaintiff was asked if he wished to go to the hospital, but he refused stating that he would see his treating physician.

Upon being cleared to do so, the plaintiff left the scene of the accident and proceeded directly to Dr. Butcofski's office in Wilkes-Barre, Pennsylvania. The plaintiff reported to Dr. Butcofski having been struck by a military vehicle and having a severe headache, as well as pain in his neck, shoulders, and the middle of his lower back to his coccyx. (P-2, Office Notes of Dr. Butcofski dated March 22, 2004).  In addition, he complained of tingling and numbness in his legs and numbness in his right foot. (Id.). The plaintiff was diagnosed with a concussion; lumbar spine pain; and neck pain. (Id.). Dr. Butcofski

---

[2] Notwithstanding the government's inexplicable failure to concede negligence in this case, Sgt. Fuller's candor and honesty at trial are commendable.

ordered testing of the plaintiff's head, neck, and lumbar spine and prescribed Percocet for pain. The plaintiff's prognosis was noted to be guarded. An appointment was made for the plaintiff to follow-up with Dr. Sedor.

On April 7, 2004, the plaintiff returned to see Dr. Sedor for the first time since his surgery in 2002. (P-3, Office Notes of Dr. Sedor dated April 7, 2004). While the plaintiff noted improvement in his neck symptoms, he indicated that he continued to have right leg numbness and paresthesias. (Id.). Upon examination, Dr. Sedor noted that the plaintiff had pain and restrictions with his neck, and continued to have significant complaints about his back.  At this visit, it was recommended that the plaintiff have a course of physical therapy. Additional testing was also ordered. (P-3 Office Notes of Dr. Sedor dated April 7, 2004).

Dr. Sedor testified concerning the significant MRI findings subsequent to the accident, indicating the plaintiff had a broadly herniated disc where the nerve root exits from the cervical spine, which was determined to be causing the plaintiff's neck, shoulder, and arm pain. In the low back, the MRIs exhibited an increase in the height of the disc space where the plaintiff had prior surgery and a narrowing of the canal where the nerve travels into the legs, thereby causing the plaintiff's back and leg pain. The plaintiff also followed up with Dr. Butcofski on April 27, 2004, as he was managing the plaintiff's pain medication.

On April 29, 2004, the plaintiff reported to Dr. Butcofski for an

6

unscheduled visit. The plaintiff reported having been in a minor car accident on April 28, 2008.  He stated that the side of his vehicle had been hit by an individual backing out of a parking space. He indicated that he had no change or worsening of his condition because of this subsequent accident, but was seeking an examination out of caution. Dr. Butcofski opined that the subsequent accident was of no consequence and that no additional treatment would be necessary with respect to this accident because the plaintiff's prior symptoms and complaints remained unchanged.

The plaintiff underwent physical therapy for his condition, as ordered by Dr. Sedor, from June 2004 through December 2004 at Pro Rehab. The plaintiff reported only temporary relief from physical therapy, usually lasting only one-half to one day. The plaintiff's therapy included aquatic therapy, the use of a TENS[3] unit, which he indicated caused more pain than relief, and a home traction unit. The plaintiff stopped therapy in December of 2004 when his insurance company discontinued payment for therapy sessions. He has not attempted any further physical therapy or form of "self-help" for his condition since then. In December 2005, Dr. Butcofski downgraded the plaintiff's prognosis from guarded to poor based upon his lack of response to medical treatment and his continued complaints of pain.

Presently, the plaintiff testified that his condition is progressively

---

[3]Transcutaneous electrical nerve stimulation. Taber's Cyclopedic Medical Dictionary at 2061 (19th ed.  2001).

worsening, in that he has increased pain in both frequency and severity from the time he wakes up in the morning until the time he goes to bed. The plaintiff takes narcotic pain medication, which he testified "takes the edge off," but does not eliminate his pain. While increased activity is sometimes a factor that contributes to the level of his pain, the plaintiff testified that he can not predict the fluctuation in his pain level. The plaintiff further testified to sleep disturbance as a result of his pain.

Concerning household matters, the plaintiff testified that he is able to do very little. Although he has most recently been able to occasionally cut the grass with a new riding lawnmower fitted with a lumbar support, the plaintiff has indicated that his wife does everything else related to household chores and maintenance.

The plaintiff testified that his recreational life, which previously included golf, bowling, and travel, has been eliminated. His intimate life with his wife has severely suffered as well.

With respect to work, although the plaintiff continues in his job in advertising sales for radio broadcasting, he testified that he has tremendous difficulty traveling to current and potential clients as a result of his inability to drive for any length of time. Although the plaintiff testified that face-to-face meetings are the best way to solicit and maintain business, and this is the method he used to establish his client base, he now, almost exclusively, communicates via the telephone instead of driving to his clients' businesses.

8

When asked about his options regarding his condition, the plaintiff testified that Dr. Sedor has informed him that he will eventually need spinal surgery.  He has chosen, however, to delay surgery as long as possible given Dr. Sedor's current opinion that the risks of surgery outweigh the potential benefits. The plaintiff testified, as did Dr. Sedor, that he will eventually require surgery when his quality of life is depleted and he is no longer able to live with his condition.

The plaintiff's wife, Paula Brown, also gave testimony relating to the March 22, 2007 accident's impact upon the plaintiff. She testified that she and the plaintiff were married in 1993 and made a conscious decision to do everything in their married life together. After marrying, they built their own home and performed all of the maintenance and work on their house together. Since the accident of March 22, Mrs. Brown testified that the complete household workload rests upon her; the plaintiff does very little. Although the plaintiff can occasionally cut the grass with the assistance of a lumbar supported riding mower, Mrs. Brown testified that she and her brothers do all of the other household work and maintenance. Mrs. Brown testified that the plaintiff continues to work at his job, but that once he comes home from work, he is unable to do any activities around the house. She testified that their recreational life has suffered in that they no longer go out to dinner, the movies, take drives in the car, bowl, or golf.  The couple's intimate life has also suffered in that sexual relations are infrequent due to the plaintiff's

constant pain and discomfort. In addition, she testified that she has been forced to sleep in a separate bedroom as her normal movement during the night causes the plaintiff pain, discomfort, and the inability to sleep.

The plaintiff has been treating with Dr. Butcofski since the 1990's. Dr. Butcofski has indicated that, based upon his forty-seven years of medical experience, the plaintiff's condition will not get any better, at best it will stay the same, but more likely will get worse. He opined that the plaintiff's complaints are valid and that the plaintiff will continue to suffer with his condition for the rest of his life.

Dr. Sedor testified that the plaintiff has been consistent with respect to his complaints and reports of limitations, and that the plaintiff's reported symptoms are consistent with his examinations and physical findings. Based upon the plaintiff's medical history and findings, Dr. Sedor has found the plaintiff's injuries to be causally related to the accident of March 22, 2004. As did Dr. Butcofski, Dr. Sedor testified that he did not consider the incident of April 28, 2004, to be of any significance because the plaintiff's complaints and symptoms did not change from what was previously reported after the March 22, 2004 accident.

Concerning the plaintiff's future status, Dr. Sedor is of the opinion that the plaintiff's condition is permanent and progressive. Eventually, the plaintiff will need surgery, the risks of which are formidable. In the best case scenario, the plaintiff will experience a slow progression of his symptoms with increased

10

limitations until ultimately, in no more than eight or nine years, he will require surgery. According to Dr. Sedor, the more likely scenario is that the plaintiff will need surgery sooner rather than later; the surgery may improve, but will not eliminate the plaintiff's symptoms; and the plaintiff will have permanent and progressive problems.  In any event, the plaintiff will never return to his normal pre-March 22, 2004, condition.

The government offered no expert medical testimony to rebut this evidence.

## III.    DISCUSSION AND CONCLUSIONS OF LAW

In this case, brought pursuant to the FTCA, Pennsylvania law applies because the alleged negligent conduct occurred in the Commonwealth of Pennsylvania. Montaperto v. Split Rock Resort, 765 F. Supp. 852 (M.D.Pa. 1991), aff'd w/o opinion, 958 F.2d 364 (3d Cir. 1992).

As an initial matter, the plaintiff requests that the court draw an adverse inference from the fact that the government listed Perry Black, M.D. as an expert witness in its pre-trial memorandum, but did not call Dr. Black to testify at trial. The plaintiff argues that the court can infer from the failure of the government to call Dr. Black that his testimony would have been unfavorable to them.

The general rule that where a party fails to produce a witness within his control, especially if the witness is friendly so that his bias would be in the

11

party's favor, it may reasonably be inferred that the information the witness would have provided would be unfavorable to such party. See Haas v. Kasnot, 92 A.2d 171 (Pa. 1952); Wilkinson v. United Par. Serv., 43 A.2d 408 (Pa. Super. 1945); Wills v. Hardcastle, 1902 WL 3204 (Pa. Super.). See also 2 Wigmore, Evidence §285 (3d. ed.1940). This rule applies to expert witnesses under Pennsylvania law.  Downey v. Weston, 301 A.2d 635, 639-40 (1973); Richardson v. LaBuz, 474 A.2d 1181, 1194-95 (Pa. Cmwlth. 1984).

In Bentivoglio v. Ralston, 288 A.2d 745 (Pa. 1972), the plaintiff claimed injuries as a result of an automobile accident. The injuries the plaintiff suffered were in dispute and the medical testimony was conflicting. The plaintiff indicated that he had been seen or treated by a number of doctors in addition to those testifying at trial. The court instructed the jury that it could draw an adverse inference from the plaintiff's failure to call the other treating doctors. Upon review, the Pennsylvania Supreme Court ruled that such an instruction was prejudicial and erroneous because it seriously affected the most important issue for the jury. In doing so, the court emphasized that the rule "is inapplicable if such witness is equally available to both sides of the litigation."

Subsequently, in Downey v. Weston, supra, the issue was the propriety of an adverse inference instruction which was given after the defendant had failed to call a doctor who had examined the plaintiff at the defendant's request, which is precisely the issue currently before this court. There, the

Pennsylvania Supreme Court, quoting Wigmore on Evidence §285, at 162 (1940) stated that the reason for the rule of an adverse inference from a party's failure to produce a witness is the natural inference that the party "fears to do so" and that this "fear is some evidence that the . . . witness . . . would have exposed facts unfavorable to the party." The court went on to state that there are two circumstances which have been recognized as negating the adverse inference: (1) the availability of the non-testifying witness to the other party; and (2) the likelihood that the testimony of the non-called witness would be "unimportant or cumulative or inferior to what is already utilized." For purposes of the instant action, only the first negating circumstance applies.  To that extent, the court in Downey concluded that the trial court should not have given the jury any instruction concerning an adverse inference because the plaintiff knew of the existence of the witness and there was no evidence that the whereabouts of the witness was unknown or that the witness would have been hostile or uncooperative. Absent a showing of the witness' unavailability to the plaintiff in that case, Downey found that no inference could be taken against the defendant who failed to call the witness.  Thus, pursuant to Downey, if a party wishes to benefit from the negative inference, that party has a burden to show as a matter of fact a clear-cut inability to obtain the testimony of the witness, even where the witness is an expert. This burden applies equally to plaintiffs and defendants who are seeking to benefit from the adverse inference. Richardson, 474 A.2d

13

at 1195.

Here, the plaintiff is seeking to benefit from the adverse inference, however, the evidence in this case is that the existence and identity of Dr. Black were known to the plaintiff. The defendant identified Dr. Black in its pre-trial memorandum and provided the plaintiff with a copy of Dr. Black's report. There is no indication that the address of Dr. Black was unknown and, in fact, the plaintiff's expert, Dr. Sedor, testified that he had previously consulted with Dr. Black on other matters. Moreover, there is no indication that Dr. Black would have rejected a request by the plaintiff to testify or that he would have been hostile or uncooperative. Therefore, the court finds that the plaintiff is not entitled to an adverse inference based upon the government's failure to call Dr. Black as a witness.

Proceeding then to the merits of the plaintiff's claim, "The elements necessary to prove an action in negligence are: (1) the existence of a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant." Atcovitz v. Gulph Mills Tennis Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002).

Here, despite the government's position at trial, there is no credible argument that Sgt. Fuller was not negligent. As to the first element of

14

negligence, it is clear that all motorists have a duty to exercise reasonable care in the operation of their vehicles. This is not disputed by either party.

On the second element, it is equally clear that Sgt. Fuller breached his duty to exercise reasonable care in the operation of his vehicle on the day in question[4]. On this element, the government argues that merely because the instant action involves a rear end collision does not necessarily mean that Sgt. Fuller was negligent. The court agrees with this general statement. In Cirquitella v. Callaghan, 200 A. 588 (Pa. 1938), the Pennsylvania Supreme Court stated that "the mere happening of a rear-end collision (does not) constitute negligence as a matter of law on the part of the operator of the rear automobile. The occurrence of such a collision does not raise a presumption that the driver of either vehicle was negligent. It is a question of fact . . . to be determined from all the evidence of the case. The plaintiff must prove that the collision resulted from the negligence of the defendant." See also, Pascale v. Simmons, 178 A.2d 549 (Pa. 1962); Meek v. Allen, 58 A.2d 370 (Pa. Super. 1948). Here the government argues that Sgt. Fuller's actions did not constitute negligence because Sgt. Fuller was only four to six feet away from the plaintiff's vehicle and that he had only looked away for "a split second"

---

[4]In so finding, the court specifically notes that there is no evidence of malice or recklessness on Sgt. Fuller's part. Rather, Sgt. Fuller simply made an unfortunate mistake, a classic "accident" that could happen to anyone while momentarily distracted.

when his vehicle impacted with the plaintiff's at a low speed[5]. The government has not presented and the court has not found any case law which would indicate that these factors, (i.e., the short distance away from the impacted vehicle, the amount of time of inattentiveness to the road, or the low speed at impact), somehow absolve a driver of the duty imposed upon motor vehicle drivers in Pennsylvania. In fact, Sgt. Fuller confirmed his negligence in his testimony to the court. He testified that while stopped behind the plaintiff, he released his foot from the brake and began moving forward. At that time, he realized that his uniform pant leg had fallen onto the car floor.  He leaned forward to fix his pant leg and was not looking when his vehicle impacted with the plaintiff's. Sgt. Fuller admitted that the accident was his fault and that the plaintiff did nothing to cause the accident. Thus, the plaintiff has proven that the defendant was negligent.

The first two elements of negligence having been established, the question becomes whether the defendant's negligence was a proximate cause of the plaintiff's injuries. Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury. Hamil v.

---

[5] In support of its "low speed" argument, the government introduced four paper copies of pictures of plaintiff's automobile. (D-4). Only the third of the four photos, the side view of the rear bumper, has relevant evidence. This picture displays a significant dent made during the impact. While there has been no expert testimony concerning the speed necessary to cause this type of damage to a plaintiff's automobile, common sense and normal life experience cannot support the government's position that it was caused by a 1- 2 mile per hour impact.

Bashline, 392 A.2d 1280, 1284 (Pa.1978). Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence. Baum v. United States, 541 F.Supp. 1349, 1351 (M.D. Pa.1982).

In this case, the only evidence presented on the issue of causation came from the testimony of Doctors Butcofski and Sedor. Their testimony unquestionably establishes that the accident in question was a substantial factor in bringing about the plaintiff's injuries. While the plaintiff had a pre-existing injury for which he underwent surgery in 2002, both doctors ruled this out as a factor contributing to his current condition. Dr. Butcofski testified that the plaintiff suffered no neck or shoulder symptoms or headaches as a result of his injury in 2002.  He testified that after surgery, the plaintiff presented with no further symptoms related to his injury. Dr. Butcofski testified that after the surgery the plaintiff was "doing fine" and was able to return to his normal activities without restrictions.

Dr. Sedor confirmed Dr. Butcofski's testimony stating that the plaintiff presented in 2002 with left leg and back pain for which he ultimately underwent surgery, including a diskectomy at the L4-5 level with "excellent relief of his pain."  Dr. Sedor saw the plaintiff only one time subsequent to that surgery at which time the plaintiff was "doing great" and no longer had any symptoms of back or leg pain. The plaintiff was released back to work with no restrictions on any of his physical activities. Notably, the Government failed

17

to call any expert witnesses to rebut, contradict, or even challenge the plaintiff's medical experts. Thus, the evidence establishes that prior to the March 22, 2004 accident the plaintiff had successfully been treated for his 2002 injury. He suffered no symptomology or residuals as a result of that injury.

Moreover, concerning the plaintiff's subsequent automobile accident on April 28, 2004, both doctors, again, ruled this out as a factor contributing to the plaintiff's current condition.  Dr. Butcofski testified that he saw the plaintiff one day after the subsequent incident at which time the plaintiff had no change or worsening in his complaints or physical findings. There was no difference in his complaints or his medical condition as a result of the subsequent incident.  Dr. Butcofski opined, as a result of his examination of the plaintiff, that the incident of April 28, 2004 had no impact on the plaintiff's condition and cleared him from any further visits as a result of that accident.

Dr. Sedor testified that the plaintiff's accident on April 28, 2004 did not change any of the medical findings from his examination on April 7, 2004, after the initial accident. Dr. Sedor testified that he did not consider the findings of the subsequent accident significant enough to even place in his medical notes.

At trial, the government presented virtually no testimonial evidence and no expert testimony to refute plaintiff's experts Doctors Butcofski and Sedor. Instead, it simply argued that a minor impact could not have caused the extent

18

of injuries alleged by the plaintiff. This, however, was completely refuted by the testimony of Dr. Sedor who established that any change in momentum or the body's position with respect to the head and the neck, like suddenly starting and stopping, can cause an injury, especially in an individual such as the plaintiff.  Dr. Sedor testified that changes in momentum in an individual with a weak spine can cause significant damage even without a tremendous amount of force. The plaintiff did come into the accident with an asymptomatic but nonetheless significant pre-existing weakness which made him more susceptible to injury. The fact that the plaintiff was particularly susceptible to injury, however, does not limit the defendant's liability because negligence causing aggravation of a pre-existing condition subjects a tortfeasor to the same degree of liability as the infliction of an original wound. The tortfeasor must take his victim as he finds him.  Fretts v. Pavetti, 422 A.2d 881, 885 (Pa.Super. 1980)(citing Pavorsky v. Engels, 188 A.2d 731 (Pa. 1963); Lebesco v. S.E. Pa. Transp. Auth., 380 A.2d 848 (Pa. Super. 1977)).

Therefore, having carefully considered the testimony and exhibits presented at trial, the court finds that the plaintiff has met his burden of establishing, by a preponderance of the evidence, that the defendant was negligent and that negligence was the proximate cause of his injuries.

## IV.   DAMAGES

Having found the United States liable for the plaintiff's injuries, the court must determine damages.

The plaintiff is seeking to be compensated for past, present, and future pain and suffering, embarrassment and humiliation, and loss of ability to enjoy the pleasures of life as a result of his injuries, including the need to restrict his physical, social, recreational, and professional activities; sleep interruption resulting from pain and discomfort; difficulty with sexual relations with his wife; and inability to perform activities of daily living, home maintenance, and household services.[6] The plaintiff is also seeking damages for future medical expenses.[7]

Under Pennsylvania law, an award for pain and suffering should include compensation not only for a plaintiff's physical pain and suffering, but also for any mental anguish, inconvenience, disfigurement, humiliation, and the loss of enjoyment of life. See McDonald v. United States, 555 F. Supp. 935 (M.D. Pa. 1983)(citing  Frankel v. Heym, 466 F.2d 1226 (3d Cir.1972); Funston v. United States, 513 F.Supp. 1000, 1010 (M.D.Pa.1981)). The nature of pain

---

[6] In the administrative proceedings, the plaintiff claimed, among other things, property damage. The parties have stipulated to the dismissal of the plaintiff's property damage claim because the plaintiff has been paid the full amount of his property damage. (Doc. No. 28).

[7]  The plaintiff has not presented any evidence with respect to medical damages incurred to date or loss of earnings. Therefore, these damages will not be factored into the court's damages award.

20

and suffering is such that there is no legal yardstick by which to accurately measure reasonable compensation for it, Herb v. Hallowell, 154 A. 582 (Pa. 1931); thus, the court is confronted with the unenviable task of dispassionately translating the plaintiff's pain and suffering into money damages. In this process, systematic logic is not helpful and precision is not achievable.  McDonald v. United States, supra, (citing Frankel v. Heym, 466 F.2d at 1228).

In addition to damages for pain and suffering, future medical expenses are recoverable under Pennsylvania law. Catalano v. Bujak, 642 A.2d 448, 449, 451 (Pa. 1994).

With the above in mind, the court has previously set forth the testimony of the plaintiff and his wife concerning the impact his injuries have had upon his life. The court has also discussed the virtually uncontradicted testimony of the plaintiff's treating physicians, who have indicated that the plaintiff's complaints of pain and limitation are consistent with the injuries he has suffered. The plaintiff's injuries are permanent and progressively worsening. Eventually, the plaintiff will need surgery, the risks of which are formidable. In the best case scenario, the plaintiff will experience a slow progression of his symptoms with increased limitations until ultimately, in no longer than eight or nine years, he will need surgery. According to Dr. Sedor, the more likely scenario is that the plaintiff will need surgery sooner rather than later; the surgery may improve, but will not eliminate the plaintiff's symptoms; and the

21

plaintiff will have permanent and progressive problems. Dr. Sedor testified that even with surgery, the plaintiff will be required to undergo a lifetime of intermittent physical or chiropractic therapy, depending on his choice; long term pain medication; and possible injection management. In any event, the plaintiff will never return to his normal pre-March 22, 2004 condition.

Although the plaintiff offered no specific estimates for the possible future spinal surgery, Dr. Sedor testified that there are optional procedures which the plaintiff may or may not choose to undergo, including spinal cord stimulation, the cost of which he estimated to be $120,000, with the generators utilized in the procedure needing to be replaced every four to six years, or a morphine pump for his low back pain which he estimates would cost in the $100,000 range, with yearly refills ranging from $12,000 to $15,000, and replacement of the device every four to six years.

In considering the plaintiff's future medical expenses, the court considers that not all future medical treatment may occur, nor be attributed to the accident of March 22, 2004. While Doctors Butcofski and Sedor have testified that the plaintiff's current injuries are the result of the accident in question, their testimony also reflects that the plaintiff had a pre-existing condition which may ultimately contribute to the need for additional treatment. Additionally the plaintiff has a pre-existing moderate osteopenia, which was described as "an unanticipated finding for a 47-year-old man." Dr. Butcofski testified that when he downgraded the plaintiff's condition from guarded to

22

poor in December 2005 this was a contributing factor in that the plaintiff showed some compression of the vertebrae in the cervical spine due to inactivity with osteoporosis, which he opined was causing the plaintiff more problems.  Thus,  the fact that the plaintiff has suffered from these conditions despite the accident of March 22, 2004, has been factored in by the court in attempting to determine reasonable future medical damages.

The court takes notice that the National Vital Statistics Reports entered into evidence by the plaintiff establishes that the plaintiff's life expectancy at the time of the accident was 31.7 years.

Given the evidence presented the court finds that an award of Two Hundred and Thirty Thousand ($230,000.00) dollars will reasonably compensate the plaintiff for all damages he sustained including his pain and suffering, as well as foreseeable future medical expenses.  As a result, a judgment will be entered in the plaintiff's favor for this amount.


## V.    CONCLUSION

For the foregoing reasons, judgment will be entered in favor of the plaintiff, and against the defendant.  An appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:** July 7, 2008

O:\shared\MEMORANDUMS\2007 MEMORANDUMS\07-0621.01.wpd

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARRY BROWN,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:07-0621** |
| **v.** | : | **(MANNION, M.J.)** |
| **UNITED STATES OF AMERICA,** | : | |
| **Defendants** | : | |

### O R D E R

Based upon the memorandum issued this day, **IT IS HEREBY ORDERED THAT** judgment be entered in favor of the plaintiff, Barry Brown, and against the defendant, United States of America, in the amount of Two Hundred and Thirty Thousand ($230,000,00) dollars.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:** July 7, 2008

O:\shared\MEMORANDUMS\2007 MEMORANDUMS\07-0621.01.wpd